1

2

3

4                             UNITED STATES DISTRICT COURT

5                                    DISTRICT OF NEVADA

6                                           * * *
                                             )
7    IN RE: WESTERN STATES                   )
     WHOLESALE NATURAL GAS                   )
8    ANTITRUST LITIGATION,                   )
     _____ )            2:06-CV-0233-PMP-PAL
9                                            )
     LEARJET, INC., et al.,                  )
10                                           )            2:03-CV-1431-PMP-PAL
                               Plaintiffs,   )            BASE FILE
11                                           )
     v.                                      )            <u>ORDER</u>
12                                           )
     ONEOK, INC., et al.,                    )
13                                           )
                               Defendants.   )
14   _____ )

15            Presently before the Court is Defendants' Motion to Dismiss on Grounds of

16   Federal Preemption and the Filed Rate Doctrine (2:06-CV-0233-PMP-PAL, Doc. #57; 2:03-

17   CV-1431-PMP-PAL, Doc. #426), filed on September 29, 2006.  Plaintiffs filed a Response

18   to Defendants' Motion Based upon Filed Rate and Federal Preemption Principles (2:06-CV-

19   0233-PMP-PAL, Doc. #71) on November 14, 2006.  On January 12, 2007, Plaintiffs filed a

20   Supplemental Memorandum (2:06-CV-0233-PMP-PAL, Doc. #82) regarding this Court's

21   December 18, 2006 Order dismissing a related case under the doctrine of field preemption.

22   Defendants filed a Reply (2:06-CV-0233-PMP-PAL, Doc. #83; 2:03-CV-1431-PMP-PAL,

23   Doc. #463) on January 26, 2007.

24            Also before the Court is Defendants' Request for Judicial Notice in Support of

25   Response to Court's Orders of April 3, 2007 (2:06-CV-0233-PMP-PAL, Doc. #91; 2:03-

26   CV-1431-PMP-PAL, Doc. #508), filed on April 25, 2007.  Plaintiffs filed a Response

(2:06-CV-0233-PMP-PAL, Doc. #94) and Joint Evidentiary Objections (2:06-CV-0233-PMP-PAL, Doc. #93) on May 23, 2007.

Also before the Court is Plaintiffs' Motion for Discovery and Continuance of Decision Pursuant to FRCP Rule 56(f) (2:06-CV-0233-PMP-PAL, Doc. #88), filed on April 25, 2007.  Defendants filed a Joint Memorandum in Opposition to Plaintiffs' Motion for Discovery and Continuance of Decision Pursuant to FRCP 56(f) (2:06-CV-0233-PMP-PAL, Doc. #92; 2:03-CV-1431-PMP-PAL, Doc. #513) on May 11, 2007.  Plaintiffs filed a Reply (2:06-CV-0233-PMP-PAL, Doc. #94) on May 23, 2007.

Also before the Court is Defendants' Motion to Strike and Memorandum in Support of Motion to Strike (2:06-CV-0233-PMP-PAL, Doc. #78), filed on December 27, 2006.  On January 12, 2007, Plaintiffs filed a Response (2:06-CV-0233-PMP-PAL, Doc. #82).  Defendants filed a Reply (2:06-CV-0233-PMP-PAL, Doc. #83; 2:03-CV-1431-PMP-PAL, Doc. #463) on January 26, 2007.

I.        BACKGROUND

This case is one of many in consolidated Multi District Litigation arising out of the energy crisis of 2000-2001.  During that time, the national energy and natural gas markets became mutually dysfunctional, and, feeding off each other spiraled into a nationwide energy crisis.  Amendments to Blanket Sales Certificates, 105 F.E.R.C. ¶ 61,217, at ¶ 12 (2003).  The Federal Energy Regulatory Commission ("FERC") undertook a fact finding investigation of the market crisis in which it concluded, "spot gas prices rose to extraordinary levels, facilitating the unprecedented price increase in the electricity market."  Id.  FERC found the dysfunctions in the natural gas market stemmed from efforts to manipulate price indices compiled by private trade publications, including reporting of

///

///

///

false data and wash trading.[1]  Id.

Plaintiffs originally filed the above action in the District Court of Wyandotte County, Kansas.  (Notice of Removal, Am. Compl. [2:06-CV-0233-PMP-PAL, Doc. #1].)  Defendants removed the case to the United States District Court for the District of Kansas.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.  (Letter dated June 14, 2006 [2:06-CV-0233-PMP-PAL, Doc. #41-1].)

In this litigation, Plaintiffs seek to recover damages on behalf of natural gas rate payers.  In the First Amended Complaint, Plaintiffs allege Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers.  (Am. Compl. at 30-32.)  Specifically, Plaintiffs allege Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, which conduct violated Kansas Statutes Annotated § 50-101, et. seq ("Kansas antitrust statutes").  (Id.)

Plaintiff Learjet, Inc. ("Learjet") is a Delaware corporation with its principal place of business in Wichita, Kansas.  (Id. at 3.)  Plaintiff Cross Oil Refining & Marketing, Inc. ("Cross Oil") is a Delaware corporation with offices located in Kansas.  (Id.)  Plaintiff Topeka Unified School District 501 ("Topeka"), is a local government unit, organized under the laws of the State of Kansas with its headquarters in Kansas.  (Id. at 4.)  Plaintiffs allege they purchased natural gas directly from one or more Defendants, and from other natural gas sellers in the State of Kansas, during the years 2000-2002.  (Id. at 3-4.)  According to the Amended Complaint, Defendants are natural gas companies that buy, sell,

---

[1] A "wash trade" is a prearranged offsetting trade of the same product between the same parties, which involves no net change in ownership and no economic risk.  Such trades create a false price for use in indices.  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, ¶ 38, ¶ 53.

1  transport, and store natural gas, including their own and their affiliates' production, in the

2  United States and in the State of Kansas.  (Id. at 4-30.)

3            Under Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss

4  Plaintiffs' Amended Complaint arguing the filed rate doctrine bars Plaintiffs' claims and

5  the Natural Gas Act ("NGA") preempts Plaintiffs' claims.  Defendants argue that because

6  Plaintiffs' allegations are essentially the same as those allegations asserted in other cases

7  this Court already has dismissed on the basis of the filed rate doctrine, the Court should

8  dismiss this case as well.  In addition, Defendants assert that even if the filed rate doctrine

9  does not apply, the Court should dismiss Plaintiffs' Amended Complaint pursuant to the

10 doctrines of field preemption and conflict preemption.  Plaintiffs respond that the filed rate

11 doctrine does not apply to this case because the Kansas antitrust statutes under which

12 Plaintiffs brought suit do not require the Court to determine what a just and reasonable rate

13 would have been absent Defendants' alleged misconduct.  Further, Plaintiffs argue federal

14 preemption does not apply to state antitrust laws.

15 **II.      LEGAL STANDARD**

16           In considering a motion to dismiss, "all well-pleaded allegations of material fact

17 are taken as true and construed in a light most favorable to the non-moving party."  Wyler

18 Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998) (citation

19 omitted).  However, the Court does not necessarily assume the truth of legal conclusions

20 merely because they are cast in the form of factual allegations in the plaintiff's complaint.

21 See Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).  There is a

22 strong presumption against dismissing an action for failure to state a claim.  See Gilligan v.

23 Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  The issue is not

24 whether the plaintiff ultimately will prevail, but whether he may offer evidence in support

25 of his claims.  Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

26 ///

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim.  See Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting Conley v. Gibson, 355 U.S. at 47).  All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Id. (citations and internal quotations omitted).  A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief.  See United States v. Howell, 318 F.2d 162, 166 (9th Cir. 1963).

**III.      DISCUSSION**

Defendants assert two alternative bases for dismissal in response to Plaintiffs' allegations of knowingly reporting false gas prices and engaging in wash trades in the natural gas market.  First, Defendants argue this Court's previous dismissal orders in In re Western States Wholesale Natural Gas Antitrust Litigation, 368 F. Supp. 2d 1110 (D. Nev. 2005) ("Texas-Ohio"), and In re Western States Wholesale Natural Gas Antitrust Litigation, 408 F. Supp. 2d 1055 (D. Nev. 2005) ("Abelman") necessitate dismissal in this case because Plaintiff's allegations are essentially the same as the allegations in those cases.  This Court ruled in Texas-Ohio and Abelman that the filed rate doctrine barred the plaintiffs' claims because the damages the plaintiffs sought would require the Court to determine what a just and reasonable rate would have been in the wholesale natural gas market absent the defendants' alleged misconduct, thereby usurping a function Congress explicitly assigned to FERC.

Plaintiffs respond that the filed rate doctrine is inapplicable to this case because of the unique nature of the Kansas "full consideration" statute under which they have brought suit.  Specifically, Plaintiffs argue Kansas' full consideration statute does not require this Court to engage in an overcharge analysis or theorize a but-for competitive

price in contravention of the filed rate doctrine.  Instead, Plaintiffs contend under the full consideration statute Plaintiffs may use routine business records, such as invoices or other financial records, to establish the complete measure of Plaintiffs' antitrust damages.

Second, Defendants argue the NGA preempts Plaintiffs' state law claims. Plaintiffs respond that pursuant to this Court's previous orders, the NGA does not preempt state law antitrust claims.

Defendants also request the Court to take judicial notice of certain facts contained in FERC orders, public disclosure filings with the Securities and Exchange Commission ("SEC"), and court orders arguing that the facts contained in these submissions provide an alternative basis for dismissal of Plaintiffs' claims.  Plaintiffs oppose the Court taking judicial notice of Defendants' submissions because the purpose behind Defendants' request is flawed and Defendants' submissions fail to meet the judicial notice standard.  Plaintiffs argue if the Court considers Defendants' submissions, it must convert Defendants' Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment because the submissions constitute evidence outside of the pleadings.  Further, to the extent the Court converts Defendants' motion to dismiss into a motion for summary judgment, Plaintiffs move for a stay and for discovery under Rule 56(f).

### A.  Filed Rate Doctrine

The NGA charges FERC with the statutory authority to ensure that all rates charged for the interstate sale of natural gas are just and reasonable.  Section 717c(a) of the NGA provides:

> All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

15 U.S.C. § 717c(a).  In interpreting the scope of FERC's power under the NGA, the

Supreme Court has found that, "the authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in the Commission." Ark. La. Gas Co. v. Hall, 453 U.S. 571, 573 (1981).

"The 'filed rate doctrine' prohibits a federally regulated seller of natural gas from charging rates higher than those filed with the Federal Energy Regulatory Commission pursuant to the Natural Gas Act . . . ." Id. Two basic principles underlie the filed rate doctrine: (1) "no court may substitute its own judgment on reasonableness for the judgment of the Commission;" and (2) "the authority to decide whether rates are reasonable is vested solely in FERC." Id. at 577.

The United States Court of Appeals for the Ninth Circuit has explained that "[t]he doctrine applies to rates charged by railroads, natural gas companies, and other interstate operators over whom federal agencies have exclusive power to set rates." Transmission Agency of N. Cal v. Sierra Pac. Power Co., 295 F.3d 918, 929 (9th Cir. 2002) (internal citations omitted). The filed rate doctrine applies both to federal and state causes of action relating to rates established by federal agencies. County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858, 863 (9th Cir. 1997). To allow recovery under state law would allow a state court, or a federal court applying state law, to undermine the authority of a federal agency and impermissibly would contravene the Supremacy Clause. Id.

In Stanislaus, the plaintiffs, natural gas consumers, sued the defendant public utility company alleging various antitrust violations. Id. at 860. The Ninth Circuit concluded that because FERC reviewed the price set between the plaintiffs and the defendant, the filed rate doctrine barred all claims in the case. Id. at 863. Specifically, the file rate doctrine barred the damages calculation because the Court would have to determine what the rate would have been absent the alleged misconduct. Id. A claim for damages based on a filed rate was too speculative because it would have required a showing that FERC should and would have adopted a hypothetical lower rate. Id.

1    In Abelman, this Court stated "[t]he critical factor in the filed rate doctrine's

2    application is the nature of the damages the plaintiff s[eeks]."  408 F. Supp. 2d at 1068.

3    The Court dismissed the plaintiffs' claims under the filed rate doctrine because the damages

4    the plaintiffs sought would have required the Court "to make a determination as to what a

5    just and reasonable rate would have been in the wholesale natural gas market, thereby

6    usurping a function Congress has explicitly assigned to FERC."  Id. at 1067.

7    The Kansas full consideration statute states:

8    any person injured or damaged by any such arrangement, contract,
     agreement, trust or combination, described in K.S.A. 50-112 and 50-
9    113, and amendments thereto, may sue for and recover in any court of
     competent jurisdiction in this state, of any person, the full
10   consideration or sum paid by such person for any goods, wares,
     merchandise and articles included in or advanced or controlled in price
11   by such combination, or the full amount of money borrowed.

12   Kan. Stat. Ann. § 50-115.  Under this statute, Plaintiffs' damage calculation will not require

13   the Court to determine what a just and reasonable rate would have been in the natural gas

14   market absent Defendants' alleged misconduct.  Rather, Plaintiffs will be able to calculate

15   damages under the full consideration statute by presenting evidence of sums paid to

16   Defendants for natural gas during the relevant time period.

17   Defendants argue even if the Kansas full consideration statute permits Plaintiffs

18   to show damages without running afoul of the filed rate doctrine, Plaintiffs must prove

19   Defendants' alleged misconduct injured Plaintiffs.  Defendants argue Plaintiffs cannot

20   prove an antitrust injury, which is a prerequisite to an award of the full consideration

21   damage remedy, without requiring the Court to calculate what rates would have been in the

22   interstate natural gas market absent Defendants' alleged misconduct.  Defendants argue if

23   Plaintiffs cannot show Defendants' alleged misconduct artificially raised rates, then

24   Plaintiffs cannot prove they sustained injury entitling them to recover damages.  In addition,

25   Defendants argue Plaintiffs expressly allege in the Amended Complaint that they were

26   injured as a result of having to pay more for natural gas than they would have paid in the

1   absence of Defendants' misconduct.  Thus, Defendants argue any attempt by Plaintiffs to

2   show an alternative injury is not supported by the allegations in the Amended Complaint.

3        In response, Plaintiffs argue they will not have to establish Defendants charged

4   artificially higher prices to establish injury, but only that Defendants controlled or

5   manipulated prices.  Plaintiffs argue they are able to show Defendants' conspiracy to

6   manipulate or control prices injured Plaintiffs because they were deprived of the right to

7   make risk management, resource allocation and other financial decisions in a full and free

8   natural gas market.

9        Kansas Statutes Annotated § 50-112 states in relevant part:

10       All arrangements, contracts, agreements, trusts, or combinations
         between persons made with a view or which tend to prevent full and
11       free competition in the importation, transportation or sale of articles
         imported into this state, or in the product, manufacture or sale of
12       articles of domestic growth or product of domestic raw material, . . .
         and all arrangements, contracts, agreements, trusts or combinations
13       between persons, designed or which tend to advance, reduce or control
         the price or the cost to the producer or to the consumer of any such
14       products or articles . . . are hereby declared to be against public policy,
         unlawful and void.

15

16  Under this statute, Plaintiffs may show Defendants committed an antitrust violation by

17  means other than showing Defendants' alleged misconduct artificially increased natural gas

18  prices because a person violates the statute by agreeing to control prices.  The Amended

19  Complaint alleges Defendants agreed to manipulate or control the market prices of natural

20  gas and as a result Plaintiffs were deprived of the right to make risk management, resource

21  allocation and other financial decisions in a full and free natural gas market.  (See Am.

22  Compl. ¶ 70.)  Thus, Plaintiffs have alleged a violation of the statute.

23       As for injury, the Amended Complaint repeatedly alleges Plaintiffs were injured

24  as a result of having to pay more for natural gas than they would have paid absent the

25  alleged misconduct.  Under the "Damages" section of the Amended Complaint Plaintiffs

26  allege, "[d]uring the relevant period of the antitrust violations by the defendants and their

1   co-conspirators, plaintiffs purchased natural gas, and by reason of the violations alleged

2   herein, paid more for natural gas than they would have paid in the absence of such antitrust

3   violations.  As a result, plaintiffs have been injured."  (Am. Compl. ¶ 73; <u>see also</u> ¶¶ 56-57,

4   ¶ 60, ¶ 70(d).)  However, construing the Amended Complaint in a light most favorable to

5   Plaintiffs, Plaintiffs also allege they were injured as a result of being "deprived of the right

6   to make risk management, resource allocation and other financial decisions in a full and

7   free competitive market for natural gas."  (<u>Id.</u> at ¶ 60(e).)

8        Under this injury theory, the Court will not have to determine what a just and

9   reasonable rate would have been in the interstate natural gas market.  Evidence of price

10  control, price artificiality, or Plaintiffs' financial decisions during the relevant time period

11  would not require the Court to determine whether the prices charged during the relevant

12  time period were just and reasonable or to set a but-for competitive price in contravention

13  of the filed rate doctrine.

14       Moreover, the Court rejects Defendants' argument that any damage award with

15  respect to the alleged misconduct in this case violates the filed rate doctrine because it

16  would effectively impose a different rate on FERC-jurisdictional transactions and upset the

17  federal scheme of uniform rate regulation.  At its core, "[t]he filed rate doctrine bars all

18  claims that would involve an assessment of what rates would have been charged in the

19  interstate natural gas market absent the allegedly wrongful conduct."  (Defs.' Mot. to

20  Dismiss & Mem. in Support of Mot. to Dismiss, at 6.)  Awarding full consideration

21  damages under the Kansas antitrust statutes would not require the Court to make "an

22  assessment of what rates would have been charged" or to determine the reasonableness of

23  such rates.  Further, to the extent Defendants argue that they could pass on any damage

24  award to their customers which might  affect future rates, the reasonableness, amount, and

25  lawfulness of such future rates would fall squarely within FERC's jurisdiction.  By

26  awarding full consideration damages, the Court would not be setting a hypothetical rate,

1    mandating or imposing a new rate, or deciding the reasonableness of any past, present, or

2    future rate.  Consequently, the filed rate doctrine does not bar Plaintiffs' Kansas antitrust

3    claims and the Court therefore will deny Defendants' motion to dismiss based on the filed

4    rate doctrine.

5    **B.  "Complete" Preemption vs. "Field" or "Conflict" Preemption**

6    Plaintiffs argue the Court already considered and rejected Defendants'

7    preemption arguments in In re Western States Wholesale Natural Gas Antitrust Litigation

8    ("In re Western States") when it ruled "[n]o federal court has found the Natural Gas Act,

9    the Federal Power Act, or the Natural Gas Policy Act (NGPA) preempt state regulation of

10   the natural gas industry."  346 F. Supp. 2d 1123, 1132 (D. Nev. 2004).  Defendants respond

11   that the Court never has reached the issue of "field" or "conflict" preemption as a defense in

12   any of its prior rulings.  Instead, Defendants argue this Court's previous orders dealt with

13   the conceptually separate question of whether the doctrine of "complete" preemption

14   converted the plaintiffs' state law claims into a federal claim for purposes of removal

15   jurisdiction.

16   The doctrine of complete preemption is a jurisdictional doctrine under which

17   "federal occupation of the field necessarily converts all state law claims into federal

18   claims[.]"  Hendricks v. Dynegy Power Mktg., Inc., 160 F. Supp. 2d 1155, 1158 (S.D. Cal.

19   2001); see also Botsford v. Blue Cross & Blue Shield, 314 F.3d 390, 393 (9th Cir. 2002)

20   (stating that "[t]o preempt state-law causes of action completely, federal law must both: (1)

21   conflict with state law (conflict preemption) and (2) provide remedies that displace state

22   law remedies (displacement).").  Complete preemption is rare.  ARCO Envtl. Remediation,

23   L.L.C. v. Dep't of Health & Envtl. Quality of Mont., 213 F.3d 1108, 1114 (9th Cir. 2000).

24   In fact, federal courts seldom have identified legislation which preempts completely state

25   law causes of action.  See, e.g. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)

26   (Employee Retirement Income Security Act).  Unlike complete preemption, field and

1  conflict preemption are defenses on the merits to state law causes of action and do not

2  confer federal jurisdiction.  ARCO, 213 F.3d at 1114.

3       This Court recognized the difference between these two types of preemption

4  doctrines in In re Western States.  In that case, the defendants removed the plaintiffs'

5  California state law actions to federal court arguing, among other things, that the NGA

6  completely preempted state court jurisdiction.  The Court rejected the defendants' argument

7  finding that "no such complete preemption language appears" in the NGA and that "[n]o

8  federal court has found the Natural Gas Act, the Federal Power Act, or the Natural Gas

9  Policy Act (NGPA) preempt state regulation of the natural gas industry."  In re Western

10 States, 346 F. Supp. 2d at 1132.  The Court also recognized that field preemption, conflict

11 preemption, and the filed rate doctrine were insufficient to confer federal removal

12 jurisdiction because they are defenses on the merits.  Id. at 1137.  The preemption defenses

13 are analyzed under different legal standards, are used for different purposes, and employ

14 different tests.  Thus, the Court's previous remand orders do not control the analysis of

15 Defendants' field and conflict preemption defenses in this case.

16      **C.  Field Preemption**

17      Defendants argue Plaintiffs' state antitrust claim is preempted because

18 Defendants' alleged misconduct occurred within the "federally occupied field of interstate

19 sales and transportation of natural gas," over which FERC has exclusive control.  (Defs.'

20 Mot. to Dismiss & Mem. in Support of Mot. to Dismiss at 4.)  Moreover, Defendants argue

21 FERC is actively regulating the type of conduct alleged in the Amended Complaint

22 pursuant to its authority under the NGA.  Plaintiffs urge the Court to apply its reasoning in

23 In re Western States with respect to complete preemption to the present case and deny

24 Defendants' motion.

25      "Federal preemption of state law is rooted in the Supremacy Clause, Article VI,

26 clause 2, of the United States Constitution."  Transmission Agency of N. Cal. v. Sierra Pac.

Power Co., 295 F.3d 918, 928 (9th Cir. 2002).  Whether federal law preempts state law is a matter of congressional intent.  Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 152 (1982).  Generally, there are three situations in which state law must yield to federal law.  First, federal law preempts state law when Congress expressly so provides. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992).  Next, under the doctrine of field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted."  Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984).  Finally, under the doctrine of conflict preemption, even "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still preempted when it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  Id. (internal quotations omitted).

The NGA does not contain an express provision preempting state law. Consequently, express preemption does not apply.  As for implied preemption, when Congress evidences an intent to occupy "a given field or an identifiable portion of it . . ., the test of preemption is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.'"  Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 212-13 (1983) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236 (1947)).  "The metaphor 'occupy the field' is strongly associated with, and often taken to automatically entail, exclusive federal control."  In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d 1072, 1082 (S.D. Cal. 2003) (citing Public Util. Comm'n of Cal. v. FERC, 900 F.2d 268, 274 (D.C. Cir. 1990)).

In the context of natural gas, Congress intended to create an effective and comprehensive dual regulatory scheme that recognized the states' authority to regulate certain natural gas transactions as well as the federal government's authority over interstate

commerce.  Panhandle E. Pipe Line Co. v. Public Serv. Comm'n of Indiana, 332 U.S. 507, 520-21 (1947).  Through the NGA, Congress granted to FERC jurisdiction over matters relating to the transportation of natural gas in interstate commerce, the sale of natural gas in interstate commerce for resale, and the natural gas companies engaged in such transportation or sales.  15 U.S.C. § 717; Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 305 (1988).  Where Congress has granted FERC jurisdiction, "that jurisdiction is exclusive."  In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d at 1076; Miss. Power & Light Co. v. Miss. ex rel. Moore, 487 U.S. 354, 377 (1988) (Scalia, J. concurring) (stating that "it is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject."); Public Util. Comm'n of Cal., 900 F.2d at 274 (explaining that "if there be [FERC] jurisdiction over some component of the transaction, it is exclusive over the component.").  Accordingly, "[t]he 'bright line' division of authority adopted by Congress precludes any attempt to inject state law into areas reserved to FERC."   In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d at 1076.

Applying the doctrine of field preemption, the United States Supreme Court has rejected states' attempts to regulate those areas within FERC's exclusive jurisdiction.  For example, in Schneidewind, the Supreme Court held the NGA preempted a Michigan law requiring public utilities transporting natural gas in Michigan for public use to get approval from the Michigan Public Service Commission before they could issue long-term securities. 485 U.S. at 296-97, 300.  The Court found the NGA granted FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale.  Id. at 300-01.  Consequently, the Court had to decide whether the Michigan law "regulate[d] within this exclusively federal domain."  Id. at 305 (emphasis omitted).  In finding that federal preemption barred application of the Michigan law, the Court concluded that the Michigan law's objectives were the same as those sought by the NGA, the Michigan law was directed at "precisely the things over which FERC has comprehensive authority," and "the NGA has

equipped FERC adequately to address the precise concerns [the Michigan law] purports to manage." Id. at 307-09.  Further, elaborating on the related doctrine of conflict preemption, the Court stated that where a state law affects FERC's ability to regulate uniformly and comprehensively or presents the "prospect of interference" with FERC's regulatory power, "then the state law may be pre-empted even though collision between the state and federal regulation may not be an inevitable consequence." Id. at 310 (internal quotations omitted).

Here, the objectives sought by the Kansas antitrust statutes are the same as those sought by the NGA.  The primary purpose of the NGA is "to protect consumers against exploitation at the hands of natural gas companies." Fed. Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 610 (1944).  Accordingly, Congress "meant to create a comprehensive and effective regulatory scheme," that would "afford consumers a complete, permanent and effective bond of protection from excessive rates and charges" in the interstate gas market.  Panhandle E. Pipe Line Co., 332 U.S. at 520; Atl. Ref. Co. v. Pub. Serv. Comm'n of New York, 360 U.S. 378, 388 (1959).  As part of its regulatory scheme, the NGA gives "FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale" and over the natural gas companies engaged in such transportation and sales.  Schneidewind, 485 U.S. at 300-01; 15 U.S.C. § 717(b); see also Ill. Natural Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 507 (1942) (stating that Congress intended for the NGA "to occupy th[e] field" of wholesale sales in interstate commerce).

The purpose of Kansas Statutes Annotated chapter 50, as its title points out, is to prevent unfair trade and to provide consumer protection.  More specifically, the Kansas legislature designed the antitrust statutes to prevent conspiratorial conduct intended to control "trade, transportation, production, price, or traffic in commercial commodities." State v. Int'l Harvester Co. of Am., 99 P. 603, 606 (Kan. 1909).  Both statutory schemes are aimed at protecting consumers from exploitative conduct in the areas of transportation,

pricing, and sales of natural gas.

Further, the Kansas antitrust statutes are directed at matters over which FERC has exclusive control pursuant to its authority under the NGA.  Under section one of the NGA (15 U.S.C. § 717), FERC has jurisdiction over natural gas companies engaged in the transportation or sale of natural gas in interstate commerce for resale.  To engage in such sales, section seven of the NGA requires a natural gas company to obtain FERC's authorization in the form of a certificate of public convenience and necessity.  15 U.S.C. § 717(f)(c)(1)(A).  The NGA grants FERC the power to "to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."  15 U.S.C. § 717(f)(e).  The NGA also charges FERC with the responsibility of ensuring that natural gas companies within its jurisdiction charge rates that are just and reasonable.  15 U.S.C. § 717(c).  To this end, the NGA gives FERC the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter."  15 U.S.C. § 717(o).

As a result of various changes in the natural gas industry, including Congressional legislation aimed at deregulation, FERC decided, pursuant to its authority under section seven of the NGA, to issue blanket certificates allowing pipelines and other persons selling natural gas to make wholesale sales at negotiated or market-based rates.  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 7 (2003), rehearing denied, 107 F.E.R.C. ¶ 61,174 (2004); 18 C.F.R. § 284.402(a).  The purpose of the blanket certificates was to "foster a truly competitive market for natural gas sales for resale in interstate commerce, giving purchasers of natural gas access to multiple sources of natural gas and the opportunity to make gas purchasing decisions in accord with market conditions."  In re Amendments to Blanket Sales Certificates, 107 F.E.R.C. 61,174, at ¶ 12 (2004) (internal quotation omitted).  These "blanket certificates were issued by operation of

1   the rule itself and there was no requirement for persons to file applications seeking such

2   authorization." Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 11

3   (2003).

4          While FERC's decision to issue blanket certificates was another step toward

5   deregulation of the natural gas market, that does not mean FERC's jurisdiction or ability to

6   re-institute regulations pertaining to the interstate wholesale market diminished.  Further,

7   the deregulation of the natural gas market does not imply Congress no longer intended to

8   occupy the field of matters relating to the interstate wholesale market.  See Transcontinental

9   Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss., 474 U.S. 409, 422 (1986) (explaining

10  that "a federal decision to forgo regulation in a given area may imply an authoritative

11  federal determination that the area is best left unregulated, and in that event would have as

12  much preemptive force as a decision to regulate") (internal quotation omitted) (emphasis in

13  original).

14         FERC's issuance "of certificate authority to make jurisdictional sales of natural

15  gas implicitly prohibited acts which would manipulate the competitive market for natural

16  gas." In re Amendments to Blanket Sales Certificates, 107 F.E.R.C. 61,174, at ¶ 12.

17  Consequently, FERC maintained the power not only to monitor the market to ensure that

18  natural gas companies charged just and reasonable rates under the NGA, but also to

19  condition and terminate a seller's certificate for misconduct.  Id. at ¶¶ 6, 11; see also

20  Regulations Governing Blanket Marketer Sales Certificates, 57 Fed. Reg. 57,952, 57,958

21  (Dec. 8, 1992) (codified in 18 C.F.R. part 284) (stating FERC will "monitor the operation

22  of the market through the complaint process."); Wyoming-California Pipeline Co., 70

23  F.E.R.C. ¶ 61,041, 61,130 (1995) (explaining "there can be no question that the

24  Commission has the authority to revoke a certificate for violation of its terms.") (emphasis

25  in original); Enron Power Mktg. Inc., 103 F.E.R.C. ¶ 61,343, at ¶ 70 (2003) (stating that for

26  FERC to carry out the NGA's purposes, "it must have the authority to terminate a certificate

1  when the holder violates the certificate by deliberately engaging in misconduct that

2  undermines the basic purpose for issuing the certificate in the first instance.").

3        However, "[i]n light of the market manipulations in the West in 2000-2001,

4  which occurred despite the implicit prohibitions in gas certificate authorizations . . ., the

5  Commission found it necessary, in order to ensure the competitiveness of the market, to

6  explicitly prohibit acts intended to manipulate the natural gas market . . . ."  In re

7  Amendments to Blanket Sales Certificates, 107 F.E.R.C. 61,174, at ¶ 12.  As a result, in

8  2003, FERC made explicit what was once implicit by issuing Order No. 644, which

9  amended the blanket certificates so as to integrate a code of conduct expressly prohibiting

10  "jurisdictional sellers from undermining the competitiveness of the marketplace by

11  engaging in abusive or manipulative acts," such as wash trades, collusion, and false

12  reporting to price indices.  Id. at ¶ 17.

13        FERC issued Order No. 644 pursuant to its power under sections five, seven, and

14  sixteen of the NGA without any additional authorizing legislation.  Order No. 644

15  summarizes FERC's regulatory scheme as follows:

16        Under [18 C.F.R. § 284.403] . . . any person making natural gas sales
       for resale in interstate commerce . . . is prohibited from engaging in
17        actions without a legitimate business purpose that manipulate or
       attempt to manipulate market conditions, including wash trades and
18        collusion.

19        To the extent [such a person] . . . engages in reporting of transactions
       to publishers of gas price indices, [it] shall provide complete and
20        accurate information to any such publisher . . . .

21  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶¶ 4-5 (2003).

22        FERC's code of conduct was based in part on FERC's Price Discovery in Natural

23  Gas & Electric Markets in which FERC issued a Policy Statement after "exploring the

24  process by which price indices influence and reflect the formation of wholesale prices for

25  natural gas and electricity."  104 F.E.R.C. 61,121, at ¶ 1 (2003).  In the Policy Statement,

26  ///

FERC stated it has "broad authority under Sections 14(a) and 16 of the Natural Gas Act[2] . . . to investigate and gather relevant data and to make such orders, rules and regulations as may be necessary to carry out the provisions of the NGA." Id. at ¶ 44. Accordingly, FERC drafted the code of conduct to "strike a careful balance" between giving customers "an effective remedy in the event anticompetitive behavior or other market abuses occur" and providing sellers "clearly-delineated" rules to follow. Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 2. Further, FERC designed the code "to provide market participants adequate opportunities to detect, and the Commission to remedy, market abuses." Id. at ¶ 6.

The Kansas antitrust statutes seek to proscribe all conspiratorial conduct intended or which tends to "prevent full and free competition" or which "advance[s], reduce[s], or control[s] the price . . . to the consumer." Kan. Stat. Ann. § 50-112. This broad language is directed at prohibiting the very conduct FERC expressly proscribed in Order No. 644 pursuant to its authority under the NGA.

Finally, the NGA has equipped FERC to address the behavior the Kansas antitrust statutes seek to manage. According to the Ninth Circuit, FERC "possesses broad remedial authority to address anti-competitive behavior." Cal. ex rel. Lockyer v. FERC, 383 F.3d 1006, 1015 (9th Cir. 2004). Pursuant to its power under the NGA, FERC has the

---

[2] Section 14(a) of the NGA (15 U.S.C. § 717m(a)) provides:

The Commission may investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person has violated or is about to violate any provisions of this chapter or any rule, regulation, or order thereunder . . . .

Section 16 of the NGA (15 U.S.C. § 717o) provides:

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

authority to investigate and gather data, to make any rules and regulations necessary to carry out the NGA's provisions, and to fashion appropriate remedies for violations of its regulations.  15 U.S.C. § 717m(a), § 717o; Cal. ex rel. Lockyer, 383 F.3d at 1015. Specifically, Congress gave FERC the authority to address claims of unreasonable and unjust rates and to set new rates.  See 15 U.S.C. § 717d(a) (authorizing FERC to hold hearings to determine whether a rate is just and reasonable and, in the event it is not, empowering FERC to set a new rate that is just and reasonable).

In addition, FERC has the power to suspend or revoke a certificate holder's certificate.  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 5; see also Enron Power Marketing, Inc., 103 F.E.R.C. 61,343, at ¶ 1 (2003) (terminating the blanket marketing certificates of various Enron gas marketers for misconduct occurring during the years 2000-2001 pursuant to FERC's authority under sections five, seven, and sixteen of the NGA (15 U.S.C. §§ 717d, 717f, 717o)).  Finally, FERC "has the authority under the NGA to require a jurisdictional seller to return unjust profits made in violation of its certificate authorization."  In re Amendments to Blanket Sales Certificates, 107 F.E.R.C. ¶ 61,174, at ¶ 73 (2004); Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 5 (violating the code of conduct "may result in disgorgement of unjust profits . . . ."); see also Consolidated Gas Transmission Corp. v. F.E.R.C., 771 F.2d 1536, 1550 (D.C. Cir. 1985) (finding that FERC had the authority under sections seven and sixteen of the NGA to order retroactive refunds to remedy violations of certificate conditions).

The fact that the remedies available under federal law may not be as comprehensive as the remedies that otherwise would be available under state law is irrelevant.  See Ark. La. Gas Co. v. Hall, 453 U.S. 571, 584 (1981) (recognizing that "[a] finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed"); Transmission Agency of N. Cal., 295 F.3d at 931-32 (stating that it is not unlikely that a finding of preemption "may leave [a plaintiff's]

state law claims unredressed").  Consequently, for all of these reasons, the NGA preempts state laws seeking to manage matters pertaining to the field of interstate natural gas sales for resale, the companies engaged in such sales, and those companies' actions "taken without a legitimate business purpose and that are intended to or foreseeably could manipulate market prices, market conditions, or market rules for natural gas."  18 C.F.R. § 284.403 (2003).

Although the Kansas antitrust statutes may not present an imminent collision with the NGA, they do present the prospect of interference with FERC's regulatory power, which, under Schneidewind, also justifies conflict preemption.  Allowing Plaintiffs' claims to go forward would disrupt FERC's ability to regulate comprehensively those areas within its jurisdiction and affect the uniformity of regulation in the wholesale natural gas market.  Instead of bringing complaints to FERC's attention and allowing FERC to apply its unitary regulations, private parties could seek relief under differing state laws providing for various alternative remedies, thus causing a balkanization of national natural gas policy.  Such a result contravenes Congress' intent to create a comprehensive and effective regulatory scheme that provides consumers a complete, permanent, and effective bond of protection from exploitation at the hands of natural gas companies and intrudes upon FERC's authority to regulate the interstate wholesale natural gas market.  Accordingly, if Defendants are natural gas companies who engaged in sales for resale during the relevant time period pursuant to blanket certificate authority,  Defendants' alleged misconduct falls within FERC's exclusive jurisdiction and Plaintiffs' state antitrust claims are preempted under the NGA.

Whether FERC has jurisdiction over Defendants and their alleged misconduct depends on whether Defendants engaged in sales for resale within FERC's jurisdiction ("jurisdictional sales") during the relevant time period.  If Defendants engaged in jurisdictional sales during the relevant time period, even if those sales were not to Plaintiffs, FERC has jurisdiction over Defendants and their alleged misconduct.

Pursuant to FERC Order 644, FERC "issued blanket certificates to all persons who are not interstate pipelines authorizing them to make jurisdictional sales for resale." Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 11 (2003).  The authorization occurred "by operation of the rule itself," which meant "there was no requirement for persons to file applications seeking such authorization."  Id.  Accordingly, Defendants received blanket marketing certificate authority as a matter of law authorizing them to make jurisdictional sales.  However, based on the allegations in the Amended Complaint, which the Court must construe in a light most favorable to Plaintiffs, it is unclear whether Defendants actually engaged in such sales for resale pursuant to their blanket certificate authority.[3]  Consequently, under the motion to dismiss standard, the Court cannot conclude the NGA preempts Plaintiffs' claims under the Kansas antitrust statutes because it is uncertain whether FERC has jurisdiction over Defendants and their alleged misconduct based upon the allegations in the Amended Complaint.

At the May 30 hearing and in their papers, Defendants assert two arguments attempting to show they engaged in jurisdictional sales during the relevant time period of 2000-2002.  First, Defendants argue that by pleading Defendants engaged in "wash trades" and "churning,[4]" Plaintiffs pleaded that Defendants engaged in jurisdictional sales because wash trades and churning are by definition "sales for resale."  Defendants' assertion that

---

[3] If Defendants engaged in sales for resale within FERC's jurisdiction during the relevant time period, then FERC has jurisdiction over Defendants' alleged misconduct.  While FERC did not expressly prohibit false reporting and wash trades during the relevant time period, it did so later in 2003 without any additional authorizing legislation from Congress.  This demonstrates FERC always had the power to regulate the conduct of persons engaged in sales for resale subject to FERC's jurisdiction.  However, FERC's promulgation of its Code of Conduct in 2003 was limited in scope and applied only to those persons making natural gas sales for resale in interstate commerce.  See 18 C.F.R. § 284.403 (2003).

[4] "Churning" refers to rapid sales and corresponding purchases of product that result in the appearance of an increase in market demand.  In re W. States, 346 F. Supp. 2d at 1135 n.10.

1    wash trades and churning are by definition sales for resale, even if true, does not mean the

2    alleged wash trades and churning occurred within FERC's jurisdiction because not all sales

3    for resale are jurisdictional sales.

4           The Natural Gas Policy Act ("NGPA") deregulated "first sales" of natural gas,

5    which are defined as "any sale to an interstate or intrastate pipeline, LDC [local distribution

6    company] or retail customer, or any sale in the chain of transactions prior to a sale to the

7    interstate or intrastate pipeline or LDC or retail customer." Amendments to Blanket Sales

8    Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 14 (emphasis omitted).  Thus, "all sales in the chain

9    from the producer to the ultimate consumer are first sales until the gas is purchased by an

10   interstate pipeline, intrastate pipeline, or LDC." Id.  However, a sale "of any volume of

11   natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or

12   any affiliate thereof" is exempted from first sale status and therefore falls under FERC's

13   jurisdiction "unless such sale is attributable to volumes of natural gas produced by such

14   interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate

15   thereof." 15 U.S.C. § 3301(21).  In other words, FERC has jurisdiction over "all sales for

16   resale by interstate and intrastate pipelines and LDCs and their affiliates, other than their

17   sales of their own production." Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶

18   61,217, at ¶ 14.

19          The Amended Complaint alleges Defendants' sales of natural gas included their

20   own or their affiliates' production.  (Am. Compl. at 30.)  Thus, taking the allegations in the

21   Amended Complaint as true, even if Defendants' alleged wash trades and churning are by

22   definition sales for resale, they are not necessarily jurisdictional sales for resale under the

23   first sales exemption because FERC does not have jurisdiction over sales for resale by

24   interstate and intrastate pipelines, LDCs, and their affiliates if they sell their own

25   production.  Accordingly, based on the Amended Complaint, the Court cannot conclude

26   Defendants' alleged wash trades and churning are sales for resale within FERC's

jurisdiction.

Second, Defendants argue FERC has stated in two of its previous orders that at least two Defendants' transactions fell within FERC's jurisdiction during the relevant time period.  FERC issued two orders with respect to Defendants Reliant and Duke Energy in October 2003 and December 2003, respectively.[5]

"When ruling on a motion to dismiss, the Court may consider the facts alleged in the Complaint, documents attached to the Complaint, documents relied upon but not attached to the Complaint when authenticity is not contested, and matters of which the Court takes judicial notice."  Marsh v. San Diego County, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006).  Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  As to the second category of judicially noticeable facts, a court appropriately may take judicial notice of matters of public record, including FERC orders.  Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 924 n.3 (9th Cir. 2002); Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001).  However, when a court takes judicial notice of a matter of public record, such as another court's opinion, it may not do so "'for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'"  Lee, 250 F.3d at 690 (quoting S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 426-27 (3d Cir. 1999)); see also Marsh, 432 F. Supp. 2d at 1044 (stating a court may take judicial notice of a document's contents, but not the truth of those contents).

---

[5] Order Approving Stipulation & Consent Agreement (Reliant), 105 F.E.R.C. ¶ 61008, ¶ 29 (2003); Order Approving Stipulation & Consent Agreement (Duke), 105 F.E.R.C. ¶ 61307, ¶ 16 (2003).

The Court may take judicial notice of FERC's orders with respect to Reliant and Duke Energy under Fed. R. Evid. 201 because the orders are not subject to reasonable dispute and are capable of accurate and ready determination.  The Court, however, may not take judicial notice of the orders for the truth of the facts stated therein, i.e. that Reliant and Duke Energy engaged in jurisdictional sales during the relevant time period.  Because this is precisely the purpose for which Reliant and Duke Energy offer the orders, the Court will not take judicial notice of them and therefore will not dismiss Reliant and Duke Energy on that basis.

Because the Amended Complaint does not allege Defendants engaged in jurisdictional sales during the relevant time period, the Court is unable to conclude Defendants' alleged misconduct falls within FERC's exclusive jurisdiction under the NGA and therefore unable to conclude the NGA preempts the Kansas antitrust claim in this case.  Accordingly, the Court will deny Defendants' motion to dismiss based on preemption.

**D.  Judicial Notice & Motion for Discovery under Fed. R. Civ. P. 56(f)**

Although not requested by the Court, Defendants submitted FERC orders and filings, public disclosure filings with the Securities and Exchange Commission ("SEC"), and court orders in an effort to establish particular affiliations with natural gas pipelines or LDCs during the relevant time period.  Defendants request the Court take judicial notice of the facts contained in their submissions and argue that these affiliations provide an independent basis for FERC jurisdiction and therefore provide an alternative ground for dismissal of Plaintiffs' claims.  In response, Plaintiffs contend the Court should not consider Defendants' submissions because the Court did not request them, the premise upon which Defendants' submissions are based is flawed, and Defendants' request for judicial notice does not comport with the judicial notice standard.

///

///

Defendants' affiliate argument is based on an exception to the definition of "first sales," which, as discussed above, is a category of sales over which FERC does not have jurisdiction.  Under the exception to the first sales definition, a sale "of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof" is not a first sale and therefore falls under FERC's jurisdiction "unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof."  15 U.S.C. § 3301(21).

Defendants' submissions attempting to establish individual affiliations with pipelines or LDCs only would establish FERC jurisdiction over Defendants' sales as long as Defendants and the pipelines or LDCs with whom they are affiliated did not produce the natural gas they sold.  Plaintiffs' Amended Complaint, however, specifically alleges Defendants sold natural gas, "including their own or their affiliates' production, to plaintiffs and other customers in the State of Kansas, and throughout the United States . . . ."  (Am. Compl. at 30.)  Because the Court must take as true the allegations in the Amended Complaint at the motion to dismiss stage, Plaintiffs' allegation that Defendants sold their own or their affiliates' production of natural gas would place Defendants' sales outside the first sales exception and therefore outside of FERC's jurisdiction.  Accordingly, the Court will deny Defendants' request to take judicial notice of their submissions.

Because the Court will not take judicial notice of Defendants' submissions or consider any other evidence outside of the pleadings at this stage of the litigation,[6] the Court is not converting Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) into a motion for summary judgment under Rule 56.  Accordingly, the Court will

---

[6] This includes the affidavit of George L. Donkin attached to Plaintiffs' Response.  While the Court will not consider the affidavit in ruling on Defendants' Motion to Dismiss, the Court declines to strike it.

1   deny Plaintiffs' Motion for Discovery and Continuance of Decision Pursuant to FRCP Rule

2   56(f) because no summary judgment motion is currently before the Court.

3   **IV.**    **CONCLUSION**

4        IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss on Grounds

5   of Federal Preemption and the Filed Rate Doctrine (2:06-CV-0233-PMP-PAL, Doc. #57;

6   2:03-CV-1431-PMP-PAL, Doc. #426) is hereby DENIED.

7        IT IS FURTHER ORDERED that Defendants' Request for Judicial Notice in

8   Support of Response to Court's Orders of April 3, 2007 (2:06-CV-0233-PMP-PAL, Doc.

9   #91; 2:03-CV-1431-PMP-PAL, Doc. #508) is hereby DENIED.

10        IT IS FURTHER ORDERED that Plaintiffs' Motion for Discovery and

11   Continuance of Decision Pursuant to FRCP Rule 56(f) (2:06-CV-0233-PMP-PAL, Doc.

12   #88) is hereby DENIED.

13        IT IS FURTHER ORDERED that Defendants' Motion to Strike and

14   Memorandum in Support of Motion to Strike (2:06-CV-0233-PMP-PAL, Doc. #78) is

15   hereby DENIED.

16

17   DATED:  July 27, 2007.

18

19

20                                  PHILIP M. PRO

21                                  United States District Judge

22

23

24

25

26