UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | MDL 1566<br>2:03-CV-01431-PMP-PAL<br>BASE FILE |
| J.P. MORGAN TRUST COMPANY, NATIONAL ASSOCIATION, in its Capacity as Trustee of FLI Liquidating Trust,<br><br>Plaintiff,<br>v.<br>THE WILLIAMS COMPANIES, INC., et al.,<br><br>Defendants. | MDL 1566<br>2:05-CV-01331-PMP-PAL |
| LEARJET, INC., et al.,<br><br>Plaintiffs,<br>v.<br>ONEOK, INC., et al.,<br><br>Defendants. | MDL 1566<br>2:06-CV-00233-PMP-PAL<br><br>O R D E R |

Presently before this Court is Defendants' Joint Motion for Summary Judgment (Doc. #764;[1] Doc. #108 in 2:05-CV-01331-PMP-PAL; Doc. #135 in 2:06-CV-00233-PMP-PAL), with a separate memorandum filed by Defendant Duke Energy Trading and Marketing, L.L.C. (Doc. #765), and statements of undisputed material facts and supporting

---

[1] Document numbers reference the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

declarations (Doc. ##766-771), filed on November 30, 2007. Also before the Court is Defendants Reliant Energy Services, Inc.; The Williams Companies, Inc.; Williams Merchant Services Company, Inc.; Williams Power Company, Inc.; Oneok, Inc.; and Oneok Energy Services Company, L.P.'s Joinder in Defendants' Joint Motion for Summary Judgment (Doc. #816; Doc. #119 in 2:05-CV-01331-PMP-PAL; Doc. #147 in 2:06-CV-00233-PMP-PAL), with supporting memoranda, statements of undisputed facts, and declarations (Doc. ##817-824), filed on January 7, 2008. Also before the Court is El Paso's Joinder in Defendants' Motion for Summary Judgment (Doc. #827; Doc. #125 in 2:05-CV-01331-PMP-PAL; Doc. #154 in 2:06-CV-00233-PMP-PAL) with supporting statement of undisputed facts (Doc. #828), filed on January 11, 2008.

Plaintiffs filed an Opposition (Doc. #129 in 2:05-CV-01331-PMP-PAL; Doc. #157 in 2:06-CV-00233-PMP-PAL) with supporting response to the statements of undisputed facts (Doc. #130 in 2:05-CV-01331-PMP-PAL; Doc. #158 in 2:06-CV-00233-PMP-PAL), and Joint Motion for Discovery and Continuance of Decision Pursuant to FRCP 56(e)(1) and (f) (Doc. #131/132 in 2:05-CV-01331-PMP-PAL; Doc. #159/160 in 2:06-CV-00233-PMP-PAL), filed on January 25, 2008. Defendants filed Replies (Doc. #849, #852, #853) with supporting statements of undisputed facts and declarations (Doc. #850, #851, #853, #855, #856, #857, #858, #860) on February 20, 2008. That same day, Defendants also filed an Opposition to Plaintiffs' motion for discovery (Doc. #859). Plaintiffs did not file a reply.

**I.      BACKGROUND**

This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001. Plaintiffs allege Defendants conspired to engage in anti-competitive activities with the intent to manipulate and artificially increase the price of natural gas for consumers. Specifically, Plaintiff alleges Defendants, directly and through their affiliates, conspired to manipulate the natural gas market by knowingly delivering

false reports concerning trade information to trade indices and engaging in wash trades, which conduct violated Kansas Statutes Annotated § 50-101, et. seq.

Defendants previously moved to dismiss Plaintiffs' Complaints, arguing the Natural Gas Act ("NGA") preempted Plaintiffs' claims under the doctrines of field and conflict preemption. In separate Orders, the Court suggested FERC's exclusive jurisdiction over the transportation of natural gas in interstate commerce, the sale of natural gas in interstate commerce for resale, and the natural gas companies engaged in such transportation or sales, may preempt Plaintiffs' state law antitrust claims. (Order [Doc. #448] at 6-16; Order [Doc. #547] at 6-11.) In J.P. Morgan, the Court dismissed Plaintiffs' claims as preempted on the belief that Plaintiffs conceded Defendants participated in the interstate natural gas market and FERC therefore had exclusive jurisdiction over Defendants' alleged misconduct in the wholesale natural gas market. (Order [Doc. #448] at 15-16.) The Court later reconsidered this ruling based on Plaintiffs' clarification that in fact they did not concede the factual question of Defendants' participation in the interstate market during the relevant time period. (Order [Doc. #548] at 4-9.) In Learjet, the Court ruled that FERC's exclusive jurisdiction may preempt Plaintiffs' claims but it was not clear from the face of the Amended Complaint that Defendants engaged in jurisdictional sales during the relevant time period, and, on a motion to dismiss, the Court had to construe the Amended Complaint in Plaintiffs' favor. (Order [Doc. #547] at 12-25.)

Defendants Duke Energy Trading and Marketing Company, L.L.C.; Dynegy Marketing and Trade; Coral Energy Resources, L.P.; Xcel Energy, Inc.; e-prime, Inc., and Western Gas Resources, Inc. now move for summary judgment, contending Plaintiffs' claims against them are federally preempted under the doctrines of field and conflict preemption. Defendants rely on this Court's previous Orders indicating federal preemption would bar Plaintiffs' claims if Defendants are natural gas companies engaged in sales for resale within FERC's jurisdiction. Specifically, Defendants note that in the Court's prior

3

1 Order in Learjet, the Court stated that "[i]f Defendants engaged in jurisdictional sales
2 during the relevant time period, even if those sales were not to Plaintiffs, FERC has
3 jurisdiction over Defendants and their alleged misconduct." (Order [Doc. #547] at 21.)
4 Defendants now come forward with evidence they engaged in jurisdictional sales during the
5 relevant time period identified in the Complaints. Defendants therefore argue they are
6 entitled to summary judgment because they are natural gas companies subject to FERC's
7 exclusive jurisdiction during the relevant time period, and consequently, Plaintiffs' claims
8 are preempted.

9 Plaintiffs respond preemption does not bar their claims because their claims are
10 based on transactions which do not fall within FERC's exclusive jurisdiction. Plaintiffs
11 contend the United States Court of Appeals for the Ninth Circuit's decisions in related
12 Multidistrict Litigation cases,[2] issued after this Court's preemption Orders, require the
13 Court to take a transactional view to determine whether claims are preempted. Plaintiffs
14 argue that because their claims are based on non-jurisdictional sales, federal preemption
15 does not apply.

16 **II.    LEGAL STANDARD**

17 Summary judgment is appropriate if "the pleadings, depositions, answers to
18 interrogatories, and admissions on file, together with the affidavits, if any" demonstrate
19 "there is no genuine issue as to any material fact . . . the moving party is entitled to a
20 judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law defines which
21 facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All
22 justifiable inferences must be viewed in the light most favorable to the non-moving party.

---

[2] See E & J Gallo Winery v. Encana Corp., 503 F.3d 1027 (9th Cir. 2007); Sierra Pac. Res. v. El Paso Corp., Slip Copy, No. 05-15127, 2007 WL 2753048 (9th Cir. Sept. 21, 2007) (unpublished); Texas-Ohio Energy, Inc. v. AEP Energy Serv., Inc., et al., Slip Copy, No. 05-15919, 2007 WL 2806331 (9th Cir. Sept. 24, 2007) (unpublished).

4

County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 531 (9th Cir. 2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. Id.; Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001).

**III.      DISCUSSION**

"Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution." Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 928 (9th Cir. 2002). Whether federal law preempts state law is a matter of congressional intent. Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta, 458 U.S. 141, 152-53 (1982). Generally, there are three situations in which state law must yield to federal law. First, federal law preempts state law when Congress expressly so provides. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). Next, under the doctrine of field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984). Finally, under the doctrine of conflict preemption, even "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Id. (internal citations omitted).

The NGA does not contain an express provision preempting state law. Consequently, express preemption does not apply. As for implied preemption, when Congress evidences an intent to occupy "a given field or an identifiable portion of it . . ., the test of preemption is whether 'the matter on which the state asserts the right to act is in any

way regulated by the federal government.'" Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 212-13 (1983) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236 (1947)). "The metaphor 'occupy the field' is strongly associated with, and often taken to automatically entail, exclusive federal control." In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d 1072, 1082 (S.D. Cal. 2003) (citing Public Util. Comm'n of Cal. v. FERC, 900 F.2d 269, 274 (D.C. Cir. 1990)).

In the context of natural gas, Congress intended to create an effective and comprehensive dual regulatory scheme that recognized the states' authority to regulate certain natural gas transactions as well as the federal government's authority over interstate commerce. Panhandle E. Pipe Line Co. v. Public Serv. Comm'n of Indiana, 332 U.S. 507, 520-21 (1947). Through the NGA, Congress granted to FERC jurisdiction over matters relating to the transportation of natural gas in interstate commerce, the sale of natural gas in interstate commerce for resale, and the natural gas companies engaged in such transportation or sales. 15 U.S.C. § 717(b); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 305 (1988). Where Congress has granted FERC jurisdiction, "that jurisdiction is exclusive." In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d at 1076; Miss. Power & Light Co. v. Miss. ex rel. Moore, 487 U.S. 354, 377 (1988) (Scalia, J. concurring) (stating "it is common ground that if FERC has jurisdiction over a subject, the States cannot have jurisdiction over the same subject"); Public Util. Comm'n of Cal., 900 F.2d at 274 (explaining that "if there be [FERC] jurisdiction over some component of the transaction, it is exclusive over that component"). Accordingly, "[t]he 'bright line' division of authority adopted by Congress precludes any attempt to inject state law into areas reserved to FERC." In re Cal. Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d at 1076.

Although where FERC's jurisdiction exists it is exclusive, FERC must be acting within its statutorily prescribed sphere of control to preempt state law. FERC, as a federal agency, "'literally has no power to act, let alone pre-empt the validly enacted legislation of

6

a sovereign State, unless and until Congress confers power upon it.'" New York v. F.E.R.C., 535 U.S. 1, 18 (2002) (quoting Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)). Congress carved out from FERC's jurisdiction and left the states to regulate "any other transportation or sale of natural gas or . . . the local distribution of natural gas or . . . the facilities used for such distribution or . . . the production or gathering of natural gas." 15 U.S.C. § 717(b). Additionally, Congress removed "first sales"[3] from FERC's rate-setting jurisdiction. Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (1989); E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1037 (9th Cir. 2007).

Under this dual regulatory scheme, where FERC has jurisdiction, it is exclusive and preempts state law under field and conflict preemption principles. See Order [Doc. #547] at 14-21; Schneidewind, 485 U.S. at 300-01; Ill. Natural Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 507 n.1 (1942) (stating that Congress intended for the NGA "to occupy th[e] field" of wholesale sales in interstate commerce). To the extent a plaintiff attempts to bring an antitrust claim under Kansas state law that falls within FERC's exclusive jurisdiction, such a claim is preempted. (Order [Doc. #547] at 14-21.) However, FERC's exclusive jurisdiction, and hence its preemptive force, is limited to those areas delineated in the statute, and does not extend to those areas Congress expressly removed from FERC's purview. Ill. Natural Gas Co., 314 U.S. at 507 (noting the NGA "is restricted in its application" to the transportation of natural gas in interstate commerce, the sale in interstate commerce of natural gas for resale, and to natural gas companies engaged in such transportation or sale); see also Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.,

---

[3] "[F]irst sales are, in essence, merely sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer. In other words, sales by pipelines, local distribution companies, and their affiliates cannot be first sales unless these entities are selling gas of their own production." E. & J. Gallo Winery, 503 F.3d at 1037 (citing 15 U.S.C. § 3301(21)(B)).

332 U.S. 507, 520 (1947) ("We have emphasized repeatedly that Congress meant to create a comprehensive and effective regulatory scheme, complementary in its operation to those of the states and in no manner usurping their authority. . . . The scheme was one of co-operative action between federal and state agencies." (footnote omitted)).

Due to this dual regulatory scheme, "[i]t is inevitable that jurisdictional tensions [will] arise as a result of the fact that [state and federally regulated elements coexist within] a single integrated system . . . ." Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kan., 489 U.S. 493, 515 (1989) (quotation and internal citation omitted). Treating every instance of jurisdictional tension as preempting state regulation would "thoroughly undermine precisely the division of the regulatory field that Congress went to so much trouble to establish in § 1(b), and would render Congress' specific grant of power to the States to regulate production virtually meaningless." Id. Accordingly, the United States Supreme Court has instructed courts to apply conflict preemption "sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." Id.

Plaintiffs' state law antitrust claims assert Defendants engaged in anticompetitive misconduct, including wash trades and manipulative price reporting, which affected the price Plaintiffs had to pay in first or retail sales for natural gas. Plaintiffs contend that because the transactions in which Plaintiffs purchased the natural gas are first or retail sales, which are outside FERC's jurisdiction, the NGA does not preempt their claims. Defendants argue that because Defendants engaged in jurisdictional sales during the relevant time period, they are natural gas companies as defined under the NGA, and FERC has exclusive jurisdiction over their alleged misconduct.

As a result of various changes in the natural gas industry, including Congressional legislation aimed at deregulation, FERC decided, pursuant to its authority under section seven of the NGA, to issue blanket certificates allowing pipelines and other

persons selling natural gas to make wholesale sales at negotiated or market-based rates. Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 7 (2003), rehearing denied, 107 F.E.R.C. ¶ 61,174 (2004); 18 C.F.R. § 284.402(a). The purpose of the blanket certificates was to "foster a truly competitive market for natural gas sales for resale in interstate commerce, giving purchasers of natural gas access to multiple sources of natural gas and the opportunity to make gas purchasing decisions in accord with market conditions." In re Amendments to Blanket Sales Certificates, 107 F.E.R.C. ¶ 61,174, at ¶ 12 (2004) (internal quotation omitted). These "blanket certificates were issued by operation of the rule itself and there was no requirement for persons to file applications seeking such authorization." Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 11.

FERC's issuance "of certificate authority to make jurisdictional sales of natural gas implicitly prohibited acts which would manipulate the competitive market for natural gas." In re Amendments to Blanket Sales Certificates, 107 F.E.R.C. ¶ 61,174, at ¶ 12. Consequently, FERC maintained the power not only to monitor the market to ensure that natural gas companies charged just and reasonable rates under the NGA, but also to condition and terminate a seller's certificate for misconduct. Id. at ¶¶ 6, 11; Order Revoking Market-Based Rate Authorities and Terminating Blanket Marketing Certificates, 103 F.E.R.C. ¶ 61,343, at ¶ 70 (2003) (stating that for FERC to carry out the NGA's purposes, "it must have the authority to terminate a certificate when the holder violates the certificate by deliberately engaging in misconduct that undermines the basic purpose for issuing the certificate in the first instance").

However, "[i]n light of the market manipulations in the West in 2000-2001, which occurred despite the implicit prohibitions in gas certificate authorizations . . ., the Commission found it necessary, in order to ensure the competitiveness of the market, to explicitly prohibit acts intended to manipulate the natural gas market . . . ." In re

Amendments to Blanket Sales Certificates, 107 F.E.R.C. ¶ 61,174, at ¶ 12.  As a result, in 2003, FERC made explicit what was once implicit by issuing Order No. 644, which amended the blanket certificates so as to integrate a code of conduct expressly prohibiting "jurisdictional sellers from undermining the competitiveness of the marketplace by engaging in abusive or manipulative acts," such as wash trades, collusion, and false reporting to price indices.  Id. at ¶ 17.

FERC issued Order No. 644 pursuant to its power under sections five, seven, and sixteen of the NGA without any additional authorizing legislation.  Order No. 644 summarizes FERC's Market Behavior Rules as follows:

> Under [18 C.F.R. § 284.403] . . . any person making natural gas sales for resale in interstate commerce . . . is prohibited from engaging in actions without a legitimate business purpose that manipulate or attempt to manipulate market conditions, including wash trades and collusion.
>
> . . . To the extent [such a person] . . . engages in reporting of transactions to publishers of gas price indices, [it] shall provide complete and accurate information to any such publisher . . . .

Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶¶ 4-5.

FERC's Market Behavior Rules were based in part on FERC's Price Discovery in Natural Gas & Electric Markets in which FERC issued a Policy Statement after "exploring the process by which price indices influence and reflect the formation of wholesale prices for natural gas and electricity."  104 F.E.R.C. ¶ 61,121, at ¶ 1 (2003).  In the Policy Statement, FERC stated it has "broad authority under Sections 14(a) and 16 of the Natural Gas Act[4] . . . to investigate and gather relevant data and to make such orders, rules and

---

[4] Section 14(a) of the NGA (15 U.S.C. § 717m(a)) provides:

The Commission may investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine whether any person has violated or
is about to violate any provisions of this chapter or any rule, regulation, or order thereunder . . . .

10

regulations as may be necessary to carry out the provisions of the NGA." Id. at ¶ 44. Accordingly, FERC drafted the Market Behavior Rules to "strike a careful balance" between giving customers "an effective remedy in the event anticompetitive behavior or other market abuses occur" and providing sellers "clearly-delineated" rules to follow. Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, at ¶ 2. Further, FERC designed the Rules "to provide market participants adequate opportunities to detect, and the Commission to remedy, market abuses." Id. at ¶ 6.

Congress subsequently enacted the Energy Policy Act of 2005 ("EPAct"), in which Congress expanded FERC's authority over manipulative conduct in the natural gas market. Energy Policy Act of 2005, Pub. L. No. 109-58, 199 Stat. 594 (2005). The EPAct made it unlawful "for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of natural gas ratepayers." 15 U.S.C. § 717c-1. Pursuant to this statutory command, FERC issued a new regulation setting forth prohibited manipulative conduct:

> It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of natural gas or the purchase or sale of transportation services subject to the jurisdiction of the Commission,
> (1) To use or employ any device, scheme, or artifice to defraud,
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) To engage in any act, practice, or course of business

---

Section 16 of the NGA (15 U.S.C. § 717o) provides:

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.

11

>that operates or would operate as a fraud or deceit upon
>any entity.

18 C.F.R. § 1c.1(a).

As FERC itself has explained, § 1c.1 does not "expand the types of transactions subject to the Commission's jurisdiction" under the relevant statutes. Prohibition of Energy Market Manipulation, 114 F.E.R.C. ¶ 61,047, 61,128 at ¶ 16 (2006). However, the new regulations apply if "any entity" engages in manipulative conduct "in connection with" a jurisdictional transaction. Id. "Absent such nexus to a jurisdictional transaction, however, fraud and manipulation in a non-jurisdictional transaction (such as a first or retail sale) is not subject to the new regulations." Id. Misconduct is "in connection with" a jurisdictional transaction if there is a "nexus" between an entity's fraudulent conduct and a jurisdictional transaction. Id. at ¶ 22. FERC gave the following as an example that would fall within its jurisdiction under the EPAct:

>For example, any entity engaging in a non-jurisdictional transaction through a Commission-regulated RTO/ISO market, that acts with intent or with recklessness to affect the single price auction clearing price (which sets the price of both non-jurisdictional and jurisdictional transactions), would be engaging in fraudulent conduct in connection with a jurisdictional transaction and, therefore, would be in violation of the Final Rule.

Id. Although FERC has assumed broadened authority under the EPAct, FERC has rejected the idea that Congress intended to expand its jurisdiction to include anti-manipulation authority over previously state-regulated aspects of the natural gas market, remarking that had Congress intended such a result, "it would have done so explicitly." Id. at ¶ 20.

After § 1c.1 became effective, FERC implemented this interpretation by exercising its regulatory authority over a non-jurisdictional seller engaged in a non-jurisdictional transaction. Order Denying Rehearing, 121 F.E.R.C. ¶ 61,224 (2007) ("Amaranth"). In Amaranth, FERC determined Amaranth's alleged manipulative trading of NG Futures Contracts, which FERC does not regulate directly, had a direct effect on the

price of natural gas sales within FERC's jurisdiction, and therefore Amaranth was subject to FERC's jurisdiction under the EPAct. Id. at ¶¶ 15-45. As FERC noted, this exercise of authority over a non-jurisdictional seller engaged in a non-jurisdictional transaction was a direct result of the EPAct's expansion of FERC authority:

> Prior to 2005, the Commission had authority under section 4(a) to punish manipulation by sellers in physical natural gas markets and, therefore, had promulgated "Market Behavior Rules" prohibiting manipulation by such sellers. Congress is not presumed to enact surplusage. The better interpretation is that Congress meant to expand Commission authority beyond what existed in 2005 to proscribe the conduct alleged [against Amaranth].

Id. at ¶ 29 (footnotes omitted). Although the EPAct extended FERC's jurisdictional reach over certain entities it previously could not have reached, FERC's jurisdiction over "the scope of 'transactions' . . . is the same as that covered by pre-existing NGA provisions and was not expanded by EPAct 2005." Id. at ¶ 64. FERC specifically gave the example that "a manipulation pertaining only to a 'first sale' would not be covered." Id.

Section 1c.1 became effective upon publication of the Final Rule in the Federal Register in 2006, and therefore does not apply to Defendants' alleged misconduct in this case, which allegedly occurred in 2000 to 2002. Prohibition of Energy Market Manipulation, 71 Fed. Reg. 4244-03, at ¶ 71 (Jan. 26, 2006). Nevertheless, FERC's discussion of its authority under the EPAct and § 1c.1 in contrast with its prior authority provides some guidance on the scope of FERC's jurisdiction over Defendants' alleged misconduct. FERC has indicated that both before and after the EPAct, FERC has no authority to regulate market manipulation occurring in non-jurisdictional transactions, such as first sales. Further, FERC has indicated the EPAct expanded its authority to regulate manipulation occurring in non-jurisdictional markets which affects transactions within its jurisdiction. For example, price manipulations in the retail market which affect jurisdictional rates through reporting to a common price index, now may subject any entity making such manipulations to FERC's jurisdiction. That the EPAct expanded FERC's

authority to reach such conduct implies FERC lacked that power prior to the EPAct.

Reviewing the dual regulatory scheme, FERC's limited jurisdictional reach, and FERC's interpretations of its own authority, the Court concludes the NGA does not preempt Plaintiffs' claims so long as those claims allege both that Plaintiffs were harmed by purchasing natural gas in non-jurisdictional sales transactions and that Defendants allegedly engaged in misconduct in non-jurisdictional transactions. If either the injury-causing transaction or the alleged market manipulation occurred within FERC's jurisdiction, Plaintiffs' claims would be preempted. However, where FERC has jurisdiction over neither the injury-causing sale nor the manipulative conduct, FERC lacks jurisdiction and therefore cannot preempt state law.

Because Congress specifically has removed certain subjects from FERC's jurisdiction, it is clear Congress did not intend FERC to occupy the field of market manipulation in non-jurisdictional transactions. For similar reasons, state regulation of manipulation in non-jurisdictional transactions likely would not conflict directly with federal regulation. Additionally, state antitrust laws punishing non-competitive conduct in non-jurisdictional transactions are complimentary to FERC's stated goals of eliminating manipulative conduct in jurisdictional markets to ensure competitive markets and to protect consumers against exploitation.

The Court's prior Orders were premised in part on a lack of precision on both the Court's and the parties' part regarding where the alleged market manipulation occurred. In J.P. Morgan, the Court stated that Defendants' alleged false reporting to price indices, collusion, and wash trades artificially inflated and distorted <u>wholesale gas prices</u> which damaged Plaintiff . . . ." (Order [Doc. #448] at 15-16 (emphasis added).) In Learjet, the Court discussed possible preemption, but concluded that it was unclear from the face of the Complaint whether FERC had jurisdiction over Defendants and their alleged misconduct because Defendants could have engaged only in non-jurisdictional transactions. (Order

14

[Doc. #547] at 21-24.)

Following this Court's preemption Orders, the Ninth Circuit issued decisions in related multidistrict litigation on previous orders from this Court and another district court on the issue of whether the filed rate doctrine barred similar state law claims. The filed rate doctrine refers to the principle that FERC's determination of a lawful rate preempts through the Supremacy Clause any conflicting state determination. E. & J. Gallo Winery, 503 F.3d at 1035. The filed rate doctrine bars courts from determining what a just and reasonable rate would have been absent the alleged manipulation because determining just and reasonable rates in the wholesale market lies exclusively within FERC's province. Id. at 1033-35.

In Gallo, the plaintiff alleged manipulations in the natural gas market, including wash trades and false price reporting to indices, resulting in the plaintiff paying a higher rate where the price it paid for natural gas was pegged to indices published in trade publications. Id. at 1030-31. The defendants moved for summary judgment, arguing the filed rate doctrine barred the plaintiff's claims because the district court would have to determine a hypothetical rate absent manipulation to determine the plaintiff's damages. Id. at 1032. The district court denied the motion, but certified the question for interlocutory appeal to the Ninth Circuit. Id.

The Ninth Circuit ruled that, viewing the facts in the light most favorable to the plaintiff, the indices potentially included both jurisdictional and non-jurisdictional transactions. Id. at 1045. Because it was possible the plaintiff could prove its claim relying solely on allegedly manipulated non-jurisdictional rates associated with fictitious sales, retail sales, and first sales, areas from which Congress withdrew FERC's jurisdiction, the Ninth Circuit held a genuine issue of material fact remained regarding whether the filed rate doctrine barred the plaintiff's claims. Id.

Although Gallo addressed only the preemptive force of the filed rate doctrine, the

15

opinion is instructive on the issues presently before the Court.  According to the <u>Gallo</u> Court:

> to the extent FERC has jurisdiction over the transportation of natural gas in interstate commerce and exercises that authority to approve interstate transportation rates, the Filed Rate Doctrine would prevent Gallo from basing damage claims on such rates.  However, as previously discussed, Gallo is challenging at least some conduct that is not approved by FERC, and thus not barred by FERC's jurisdiction over interstate transportation.

<u>Id.</u> at 1048; <u>see also</u> <u>Am. Gas Ass'n v. F.E.R.C.</u>, 912 F.2d 1496, 1506-07 (D.C. Cir. 1990) (rejecting pipeline companies' argument that FERC had jurisdiction over pipeline companies' non-jurisdictional contracts, even if such contracts would impact indirectly a pipeline company's FERC-approved rates).  "In the absence of FERC jurisdiction over non-jurisdictional transactions reported in the indices, the Filed Rate Doctrine does not bar damage claims based on rates arising from such transactions." <u>E. & J. Gallo Winery</u>, 503 F.3d at 1048.

    Many entities engage in both jurisdictional and non-jurisdictional sales.  That FERC has jurisdiction over entities engaged in jurisdictional sales does not mean FERC has exclusive jurisdiction over those companies' conduct in non-jurisdictional transactions.  The NGA does not "abolish all overlapping." <u>Federal Power Commission v. East Ohio Gas Co.</u>, 338 U.S. 464, 473-474 (1950).  For example, the Commission may "investigate and determine the cost of the production or transportation of natural gas by a natural-gas company in cases where the Commission has no authority to establish a rate governing the transportation or sale of such natural gas." <u>Id.</u> at 474 (citing Section 5(b) of the NGA).  "Yet clearly the state agency establishing such a rate would have equivalent authority." <u>Id.</u>  Congress has committed non-jurisdictional transactions to state control, and therefore state law would have at least equivalent authority to address manipulative conduct occurring in retail and first sales transactions, even if the entity engaged in those transactions also is subject to FERC's jurisdiction when it participates in jurisdictional sales.

Here, viewing the facts in the light most favorable to Plaintiffs, it is possible that Plaintiffs may be able to prove Defendants conspired to control natural gas rates and engaged in manipulative conduct in non-jurisdictional transactions, including wash trades and false reporting of retail and first sale rates to price reporting indices. Additionally, Plaintiffs allege they purchased natural gas at the artificial rates in non-jurisdictional transactions. In such circumstances, FERC would have no jurisdiction over either the injury-causing transaction or the transactions in which Defendants engaged in the alleged misconduct. Prior to the EPAct at least,[5] FERC would have no jurisdiction to regulate manipulative conduct in non-jurisdictional transactions, even over natural gas companies which also engaged in jurisdictional sales during the same time period.

Additionally, Defendants have not explained why it would be impossible to comply with both state and federal law where both preclude manipulative conduct in the natural gas markets. The state antitrust laws compliment FERC's goals. To the extent application of state antitrust laws to non-jurisdictional misconduct impacts matters within FERC's control, such an effect is incidental to achieving the proper state purpose of preventing anticompetitive behavior in state-controlled natural gas transactions.

The Court therefore will deny Defendants' motions for summary judgment. Defendants' status as jurisdictional sellers during the relevant time period does not preclude the possibility that Defendants engaged in manipulative conduct in non-jurisdictional transactions, such as providing false price reports on non-jurisdictional transactions to trade indices, falling outside FERC's exclusive jurisdiction. Because the Court will deny Defendants' motions, the Court also will deny Plaintiffs' motions for discovery under

---

[5] The question may be closer now under the EPAct, which gives FERC authority over manipulative conduct that indirectly affects jurisdictional rates, and where the "bright line" between state and federal regulation is blurred by interrelated price reporting to indices which include both jurisdictional and non-jurisdictional rates. The question is not before the Court, however, because Defendants' alleged conduct occurred prior to Congress expanding FERC's authority under the EPAct.

17

Federal Rule of Civil Procedure 56(f) as moot.

## IV.     CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Joint Motion for Summary Judgment (Doc. #764; Doc. #108 in 2:05-CV-01331-PMP-PAL; Doc. #135 in 2:06-CV-00233-PMP-PAL) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants Reliant Energy Services, Inc., The Williams Companies, Inc., Williams Merchant Services Company, Inc., Williams Power Company, Inc., Oneok, Inc., and Oneok Energy Services Company, L.P.'s Joinder in Defendants' Joint Motion for Summary Judgment (Doc. #816; Doc. #119 in 2:05-CV-01331-PMP-PAL; Doc. #147 in 2:06-CV-00233-PMP-PAL) is hereby DENIED.

IT IS FURTHER ORDERED that El Paso's Joinder in Defendants' Motion for Summary Judgment (Doc. #827; Doc. #125 in 2:05-CV-01331-PMP-PAL; Doc. #154 in 2:06-CV-00233-PMP-PAL) is hereby DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Joint Motion for Discovery and Continuance of Decision Pursuant to FRCP 56(e)(1) and (f) (Doc. #131/132 in 2:05-CV-01331-PMP-PAL; Doc. #159/160 in 2:06-CV-00233-PMP-PAL) is hereby DENIED.

DATED: May 14, 2008.

_____
PHILIP M. PRO
United States District Judge